James H. Power
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY  10007-3189
(212) 513-3200

ATTORNEYS FOR DEFENDANT
BEIJING SHOURONG FORWARDING SERVICE CO. LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THELMA SHIPPING CO. LTD.,

                Plaintiff,

-against-

BEIJING SHOU-RONG FORWARDING
SERVICE CO. LTD. a/k/a BEIJING SHOURONG
FORWARDING SERVICE CO. LTD.,

                Defendant.

08 Civ. 1804 (PAC)

**AFFIDAVIT OF
JAMES H. POWER IN
SUPPORT OF DEFENDANT'S
MOTION FOR
<u>COUNTERSECURITY</u>**

STATE OF NEW YORK     )
                          ) ss:
COUNTY OF NEW YORK   )

      JAMES H. POWER, being duly sworn, deposes and says:

      I am a member of the law firm Holland & Knight LLP, attorneys for Defendant BEIJING

SHOU-RONG FORWARDING SERVICE CO. LTD. a/k/a BEIJING SHOURONG

FORWARDING SERVICE CO. LTD. (hereinafter referred to as "Beijing").

1.      This Affidavit is made in support of Beijing's Motion for Countersecurity.  The statements made in this affidavit are based upon my personal knowledge and the documents annexed hereto are true and correct copies of documents provided to me by Defendant.

2.      Annexed hereto as Exhibit A is a true and correct copy of Beijing's Verified Answer with Affirmative Defenses and Counterclaim with Exhibits.

1.      Exhibit 1 to the Verified Answer with Affirmative Defenses and Counterclaim is a true and correct copy of the relevant agreement between Plaintiff and Defendant Beijing which includes a fixture recap, New York Produce Exchange Time-Charter form and Additional Clauses to the Charter Party.

2.      CLAUSE 1 of the New York Produce Exchange Charter Party states in pertinent part as follows:

> " . . . Owners shall . . . keep the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service."

3.      CLAUSE 102 in the Additional Clause to the Charter party states in pertinent part:

> "102 Excessive Delays in Port:
>
> Where the vessel remains at anchorage, in port or idle for an extended period (means excess 20 days) in compliance with Charterers' orders/instructions, and this causes fouling of the hull or underwater parts, Owners shall not be responsible for such fouling or any vessel under-performance caused by such fouling."

4.     Exhibit 2 to the Verified Answer with Affirmative Defenses and Counterclaim is a true and correct copy of an email from Plaintiff's London counsel to Beijing's London counsel dated March 13, 2008.

5.     The email from Plaintiff's London counsel to Beijing's London counsel dated March 13, 2008 contains the following statements made on behalf of Plaintiff Thelma Shipping Co. Ltd..

> "The vessel then ballested to Itaguai [Brazil] where she arrived on 5th December 2007.  Because of congestion the vessel was kept idle and only sailed from Itaguai on 23rd December.   During this time substantial bottom growth accumulated. Underwater growth is a notorious feature of Brazilian ports . . . " (paragraph 1)
>
> "It is selfevident [sic] that following the accumulation of bottom fouling at Itaguai the return laden voyage would have been performed at a reduced speed." (paragraph 4)

6.     Plaintiff and Defendant are presently engaged in London Arbitration regarding the claims asserted by each party in this case which arise under the Charter party.  The merits of the case and claims of the parties have yet to be decided in that Arbitration.

**WHEREFORE**, Defendant respectfully requests that Plaintiff be ordered to post countersecurity.

_____
James H. Power

Sworn to before me this
2̲7̲ day of March, 2008

_____
Notary Public

Elvin Ramos
Notary Public, State of New York
NO. 01RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 2010

# 5223454_v1

3

# EXHIBIT A

James H. Power
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR DEFENDANT
BEIJING SHOURONG FORWARDING SERVICE CO. LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THELMA SHIPPING CO. LTD.,

                 Plaintiff,

        -against-

BEIJING SHOU-RONG FORWARDING
SERVICE CO. LTD. a/k/a BEIJING SHOURONG
FORWARDING SERVICE CO. LTD.

                 Defendant.

08 Civ. 1804 (PAC)

## ANSWER WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIM

     Defendant, BEIJING SHOURONG FORWARDING SERVICE CO. LTD., (hereinafter "BEIJING" or "Defendant"), by and through its attorneys, Holland & Knight LLP, answering the allegations set forth in Plaintiff's Verified Complaint alleges, upon information and belief as follows:

     1.     Admitted.

2.      Denies knowledge or information sufficient to form a belief as to the allegations set forth at paragraph 2 of the Verified Complaint.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Denied.

7.      Denied.

8.      Admitted.

9.      Denied.

10.     Admitted.

11.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph 11 of the Verified Complaint.

12.     Admits that interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law and except as so admitted, denies the remaining allegations set forth in paragraph 12 of the Verified Complaint.

13.     Denies knowledge or information sufficient to form a belief as to the allegations set forth at paragraph 13 of the Verified Complaint.

14.     Denies that Plaintiff is entitled to relief requested in paragraph 14 of the Verified Complaint.

2

15.    Defendant further denies that Plaintiff is entitled to any of the relief prayed for in paragraphs A through G of the Verified Complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Verified Complaint fails to state a cause of action upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Defendant is not liable to Plaintiff on the causes of action alleged in the Verified Complaint.

### THIRD AFFIRMATIVE DEFENSE

This Court lacks personal jurisdiction over Defendant.

### FOURTH AFFIRMATIVE DEFENSE

This Court lacks *quasi in rem* jurisdiction over Defendant.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff has improperly and/or insufficiently served process on Defendant.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the equitable doctrine of unclean hands.

### SEVENTH AFFIRMATIVE DEFENSE

Any damages sustained by Plaintiff, as alleged in the Verified Complaint, were proximately caused by the negligent acts of third persons who Defendant has no direction or control.

3

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff is guilty of culpable conduct in the events giving rise to the claims now asserted in the Verified Complaint, and its recovery, if any, must be diminished in proportion thereto.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are overstated in the level of security sought from and provided by Defendant and should be reduced to a reasonable sum.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff's claim is subject to arbitration in London and is governed by English law and Defendant has no liability to Plaintiff as a matter of law.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to mitigate its damages.

### TWELFTH AFFIRMATIVE DEFENSE

This Answer and Counter-claim is made without waiver of any of the jurisdictional defenses or rights to arbitrate that may exist between the parties.

### BEIJING SHOURONG FORWARDING SERVICE CO. LTD.'S COUNTERCLAIM

As for its Counter-claim against the Plaintiff Thelma Shipping Co. Ltd., Defendant Beijing alleges as follows:

1.    This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

4

2.      At all times material herein, Beijing is and was business entity organized and existing under the laws of China.

3.      Upon information and belief, at all times material herein, Thelma Shipping Co. Ltd., is and was a business entity organized and existing under the laws of a foreign nation.

4.      At all times material to this action, Thelma Shipping Co. Ltd., was the owner of the motor vessel "MANASOTA" (hereinafter "MANASOTA" or "Vessel").

5.      Pursuant to a charter party dated November 9, 2007, Beijing time-chartered the Vessel from Thelma Shipping Co. Ltd.  A true and correct copy of the fixture recap, New York Produce Exchange Time Charter and Additional Clauses are annexed hereto as Exhibit 1.

6.      The Charter included the standard New York Produce Exchange charter party terms.

7.      Under the terms expressly set out in CLAUSE 1, owner shall "keep the vessel in a thoroughly efficient state in hull, machinery, and equipment for and during the service."

8.      CLAUSE 1 required Thelma Shipping Co. Ltd., to keep the Vessel's hull free of fouling including, but not limited to, underwater growth for the period of the charter.

9.      The Vessel was delivered to Beijing in or around the waters off Singapore on or about November 6, 2007, and shortly thereafter performed a voyage in ballast to Itaguai, Brazil to load a cargo of iron ore.

10.     The Vessel arrived in Itaguai, Brazil on December 5, 2007.

11.     Because of port delays and ships congestion, the Vessel could not immediately load its cargo of iron ore.

5

12.    Despite port delays, the Vessel nonetheless completed loading by December 23, 2007 and departed Itaguai, Brazil on December 23, 2007.  The total time between arrival at Itaguai and departure Itaguai was 18 days.

13.    Thelma Shipping Co. Ltd., by and through its London counsel, Waterson Hicks, has admitted that substantial hull growth accumulated on the Vessel during the 18 day port period in Itaguai, Brazil from December 5 through December 23, 2007.  A true and correct copy of the Waterson Hicks fax to Beijing's London counsel dated March 13, 2008, is annexed hereto as Exhibit 2.

14.    Despite Thelma Shipping Co. Ltd.'s admitted awareness that "[u]nderwater growth is a notorious feature of Brazilian ports," Thelma Shipping Co. Ltd. failed to comply with CLAUSE 1 of the Charterparty by allowing underwater growth to accumulate to such an extent that the Vessel could no longer meet the Charter's warranted speed.

15.    The Vessel, sailing direct from Itaguai, Brazil, arrived in Singapore on January 25, 2008 at which time Thelma Shipping Co. Ltd. contracted for an underwater hull inspection.

16.    The January 25, 2008, underwater hull inspection revealed, according to Thelma Shipping Co., Ltd., that the hull was "heavily fouled."

17.    As a result of the underwater growth, which Thelma Shipping Co. Ltd. allowed to accumulate in breach of the Charter Party, the Vessel failed to meet the warranted Charter Party speed for the return voyage from Brazil, a fact admitted to by Thelma Shipping Co. Ltd.'s London counsel.

18.    As a result of the Vessel's failure to perform up to the standards warranted in the Charter Party, Beijing withheld charter hire as expressly permitted by CLAUSE 102 of the Additional Clause to the Charter Party.

19.    CLAUSE 102 expressly states that Thelma Shipping Co., Ltd. is responsible for all costs for underperformance of the Vessel caused by fouling so long as the Vessel does not stay in port more than 20 days.

20.    By reason of Thelma Shipping Co. Ltd.'s breach of the Charter Party, Beijing rightfully and lawfully withheld charter hire as permitted by the Charter Party.

21.    By reason of Thelma Shipping Co. Ltd.'s breach of the Charter Party, Beijing suffered economic losses directly attributable to the vessel's under performance including, but not limited to, increased fuel costs.

22.    Despite due demand, Thelma Shipping Co. Ltd. has failed to pay the amounts due and owing to Beijing under the Charter Party.

23.    An arbitration proceeding is currently underway in London to settle the dispute between the parties.

24.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party. As best as can now be estimated, Beijing expects to recover the following amounts at arbitration as the prevailing party:

A.    Principal Claim                              $ 181,604.53

| B. | Estimated Interest on Claim | $ 35,525.14 |
|---|---|---|
| C. | Estimated Arbitration Costs | $50,000.00 |
| D. | Estimated Attorneys' Fees and Expenses | $150,000.00 |
| | TOTAL: | **$417,129.67** |

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Defendant Beijing Shourong Forwarding Service Co. Ltd., prays:

1.     That this Court dismisses the Plaintiff's Verified Complaint against the Defendant without prejudice;

2.     That this Court cites Plaintiff to answer under oath all allegations in Defendant's counterclaim;

3.     That pursuant to the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions, this Court issue an Order directing Plaintiff to post counter-security in the sum of US$ 417,129.67, failing which, (a) Plaintiff be enjoined from prosecuting its claims against Beijing Shourong Forwarding Service Co. Ltd., in the London arbitration, or any other venue; and/or (b) Plaintiff's attachment of any and all of Defendant's property attached in this action pursuant to Rule B of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions immediately be vacated;

4.     That upon the posting of Plaintiff's countersecurity in the sum of  US$ 417,129.67, that this matter be placed on the suspense calendar pending arbitration in London, and that this Court retain jurisdiction over this matter through the entry of any judgment or award

associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

5.      That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the counterclaim set forth herein as a Judgment of this Court; and

6.      That this Court grant Beijing Shourong Forwarding Service Co. Ltd., such other and further relief as the Court may deem just and proper;

Dated: New York, New York
        March 26, 2008

                                HOLLAND & KNIGHT LLP

                        By:     _____
                                James H. Power
                                Lissa D. Schaupp
                                195 Broadway
                                New York, NY 10007-3189
                                Tel:    (212) 513-3200
                                Fax:    (212) 385-9010

                                james.power@hklaw.com

                                *Attorneys for Defendant*
                                *Beijing Shourong Forwarding Service Co. Ltd.*

9

## VERIFICATION

STATE OF NEW YORK   )
          :ss.:
COUNTY OF NEW YORK  )

JAMES H. POWER, being duly sworn, deposes and says:

   I am a member of the firm of Holland & Knight LLP, counsel for Beijing Shourong

Forwarding Service Co. Ltd., Defendant in the foregoing action. I have read the foregoing

Verified Answer and Counterclaim and know the contents thereof, and the same are true and

correct to the best of my knowledge. I have reviewed documentation provided to me by Beijing

Shourong Forwarding Service Co. Ltd. representatives regarding this matter. I am authorized by

Beijing Shourong Forwarding Service Co. Ltd. to make this verification, and the reason for my

making it as opposed to an officer or director of Beijing Shourong Forwarding Service Co. Ltd.

is that there are none within the jurisdiction of this Honorable Court.

                _____
                  James H. Power

Sworn to before me this
26 day of March, 2008

_____
Notary Public   Elvin Ramos
       Notary Public, State of New York
       NO. 01RA4870243
       Qualified in Queens County
       Certificate filed in New York County
       Commission Expires September 2, 2010

# 5220642_v1

10

**EXHIBIT A1**

```
!C*IIM FG6JQ-00 0911 1447              LSS      MANA      %SHOURONG   nk<
!==================================================================
|From: "LSS Cape" <chartering@lsscape.com>
|Date: Fri, 9 Nov 2007 13:43:36 +0100
|Subject: Manasota/Shourong - clean recap
```

LSS SA

E-mail : chartering@lsscape.com

Please visit www.lsscape.com <http://www.lsscape.com/>


Nicos/Luc

Yu Qiang/Luc for Zhao Lin


Plsed to confirm flwng clean fixture


-NEGOS/FIXT STRICTLY P+C EXCEPT CASE OF STATUTORY REQUIREMENTS  OR THOSE
OF STOCK LISTED COMPANIES


MV 'MANASOTA' - ALL DETAILS 'ABOUT'

GEARLESS BULK CARRIER - MALTA FLAG

- BLT 1/2004 DWAT 171,061 MT ON ABT 17.725 M SSW DRAFT

LOA/BEAM 288.88/45.00 M

GT/NT 88,129/57,100

AHL FTTD

- NOT GRAIN CLEAN

9 HO/HA

- GRAIN BSS 100PCT ABT 191,422.2 M3

HOLD
CUBICS:18,219.8/22,056.0/22,100.9/22,099.1/21,944.6/21,974.4/22,129.5/21
,734.6/19,163.3 ALL M3

HATCH SIZES:NOS.1+9: 15.48 X 17.20 M

              NOS.2-8: 15.48 X 20.60 M

HATCH COVERS MCGREGOR SIDE ROLLING

SPEED LADEN ABT 14 KNOTS ON ABT 57 LT IFO 380CST PLUS

ABT 3 LT IFO 380CST + ABT 0.5 LT MDO DISTILLATE SPEED
BALLAST ABT 15 KNOTS ON ABT 56 LT IFO 380CST PLUS

ABT 3 LT IFO 380CST + ABT 0.5 LT MDO DISTILLATE ALWAYS UNDER
GOOD WEATHER CONDITIONS UPTO BEAUFORT FORCE 4 AND DOUGLAS SEA STATE 3
WITH NO ADVERSE CURRENT AND NO NEGATIVE INFLUENCE OF SWELL.

PORT CONSUMPTION: IDLE ABT 5.5 LT IFO 380CST + ABT 0.5 LT MDO DISTILLATE
WHEN BALLASTING/DEBALLASTING ABT 8.5 LT IFO 380CST

+ ABT 0.5 LT MDO DISTILLATE

BUNKERS SUPPLIED BY CHRTRS TO BE: IFO RMG 380, MDO DMB OR DMA AS PER ISO
8217:2005 VSL TO HAVE LIBERTY OF USING MDO DISTILATE AT
START/STOP/SWITCH GENERATOR ENGINE AT SEA, WHEN ENTERING/LEAVING PORT,
MANEUVERING IN SHALLOW/NARROW WATERS, CANALS, RIVERS AND AT OTHER
LIMITED OCCASIONS.


OWRS TO WARRANT:


A) VESSEL TO BE OWRS-CONTROLLED OR CHARTERED, SEAWORTHY, CARGO WORTHY,
TIGHT, STAUNCH AND STRONG, SUITABLE FOR INTENDED VOYAGE AND GRAB
DISCHARGE

B) VESSEL TO KEEP FULL SET OF VALID CERTS ONBOARD AND VSL ITF OR
EQUIVALENT FITTED, AND VSL FULLY COMPLY WITH TRADING REGULATIONS OF THE
INTENDED CALLING PORTS

C) VESSEL TO BE FULLY COVERED BY PNI CLUB DURING THE CHARTER

D) VESSEL TO BE GLESS SDSTBC CLASSED LLOYDS 100A1 OR EQUIVALENT

E) OWS GUARANTEE PERFORMING VSL CAN BE ACCEPTED BY RIGHTSHIP DURING THE
WHOLE C/P PERIOD.

 (PLS SUPPLY SMC/ DOC/ CLASS/ REGISTRY/ VETTING QUESTIONAIRE)


 FOR


 -ACCOUNT BEIJING SHOU-RONG FORWARDING SERVICE CO.LTD, BEIJING

 -DELY RETRO TO DLOSP ZHANJIANG AT 1300 HOURS LT ON 6TH NOV.

 -ONE TCT OF ONE LL VIA SAS/SBS/SPS/AAAA/AWIWL SINGAPORE FOR
REPLENISHING BUNKERS AND BRASIL TO PRC,  WITH LAWFULL HARMLESS BULK
CARGO WHICH TO BE LOADED/STOWED/  CARRIED/DISCHARGED IN ACCORDANCE WITH
IMO RECOMMENDATIONS AND/OR  ANY OTHER LOCAL/NATIONAL REGULATIONS AND
ALWAYS IN CONFORMITY  WITH VSL'S CLASS CERTIFICATE REQUIREMENTS.

 -SOLE CGO ALLOWED: IRON ORE MAX TWO GRADES, ALWAYS EXCLUDING DRI/DRIP/
HBI/PETCOKE/SPONGE IRON/PIG IRON.

-DURATION ABT 80-90 DAYS AG WOG

-REDELY ON DLOSP 1SP SPORE/S.JAPAN RGE (INTN PRC) ATDNSHINC

-HIRE USD 175,000PDPR INCLOT TB PAID EVERY 15 DAYSINADV TO OWS NOM BANK

-TRADING EXCL:ICELAND,SWEDEN,FINLAND,NORWAY,DENMARK,E.C.CANADA

 BETWEEN 15TH DEC/25TH APR,JORF LASFAR,'BULKWAYUU' IN MARACAIBO,  LIBYA
INCL GULF OF SIDRA/SIRTE, LEBANON, SYRIA, ISRAEL, FORMER  YUGOSLAVIA BUT
CROATIA AND SLOVENIA ALLOWED, ALBANIA, TURKISH  OCCUPIED CYPRUS,AZOV
SEA,SOMALIA,GULF OF AQABA,ETHIOPIA,IRAN,IRAQ,  ERITREA,ANGOLA INCL
CABINDA,NAMIMBIA,CIS PACIFIC,LIBERIA,NIGERIA,  SIERRA
LEONE,CAMBODIA,NORTH KOREA,HAITI,CUBA,YEMEN,SUDAN,SRI LANKA,  GEORGIA
INCL ABKHAZIA,HOKAIDO,ORINOCO RIVER,AMAZON RIVER,NICARAGUA,  DEMOCRATIC
REPUBLIC OF CONGO (FORMERLY ZAIRE), MURMANSK,ALASKA,  ANY WAR AND/OR WAR
LIKE AREAS/ ANY COUNTRIES TO WHICH U.S.A./U.N.SANCTIONS FROM TIME TO
TIME ARE IMPOSED.

NO DIRECT TRADING BETWEEN PRC/TAIWAN.

-ICE FREE PORTS/TRADING. VSL NOT TO FORCE ICE NOR TO BE ORDERED TO
FOLLOW ICE-BREAKER(S)

-A JOINT ON-HIRE BUNKER/CONDITION SURVEY TO BE CONDUCTED AT FIRST
LOADING PORT IN OWNERS' TIME UNLESS VESSEL IS RENDERING SERVICE  TO
CHARTERERS. EXPENSES TO BE SHARED EQUALLY BETWEEN CHRTRS AND OWS.

 A JOINT OFF-HIRE SURVEY FOR THE PURPOSE OF DETERMINING THE CONDITION
OF THE VESSEL HER EQUIPMENT AND QUANTITIES OF BUNKERS ON BOARD  SHALL BE
HELD AT LAST DISPORT IN CHARTERERS' TIME. THE EXPENSES  OF SUCH SURVEY
SHALL BE SHARED EQUALLY BETWEEN OWS AND CHRTRS.

-ALL HOLDS ON ARRIVAL AT CHRTS 1ST LOAD PORT TO BE CLEAN SWEPT AND
DRIED UP IN EVERY RESPECT TO LOAD CHTRS INTENDED CARGO AND TO PASS
RELEVANT SURVEYORS/AUTHORITIES INSPECTION.IF HOLDS FAIL TO PASS SUCH
INSPECTION VSL TO BE PUT OFF HIRE UNTIL REINSPECTION PASSED.

IT IS HOWEVER USTOOD AND AGREED THAT SHOULD HOLDS PARTIALLY FAILED  SUCH
INSPECTION AND LOADING OPERATIONS TAKE PLACE IN THOSE HOLDS  PASSED
THEN,IN CASE THERE IS LOSS OF TIME FOR CHRTRS, THE  VSL WILL  BE PLACED
OFF-HIRE PRORATA TO THE NUMBER OF HOLDS REJECTED ONLY.

-ILOHC ON REDELY USD6,000 LSM EXCL REMOVAL OF DUNNAGE/DEBRIS/ETC  WHICH
CHRTS CONFIRM WILL REMOVE FROM THE SHIP PRIOR REDLY

-C/V/E USD1,500 PMPR

-BROB ON DLOSP ZHANJIANG 2109 MT HSIFO AND 193 MT MDO.

 BUNKERS ARRANGED BY OWS TB REPLENISHED AT SPORE 1700-1800 MT HSIFO.

 THFRE TOTAL QTIES TB PAID BY CHRTRS 3809-3909 MT HSIFO AND 193 MT MDO.

 BOR: MINIMUM SAME QUANTITY OF HSIFO AS ON DLOSP ZHANJIANG AND QUANTITY
OF MDO AS ON BOARD WITHOUT REPLENISHMENT. CHRTS

 TO TAKE OVER AND  PAY VALUE OF BUNKERS ON DELY TOGETHER WITH THE 1ST
HIRE PAYMENT.

NO BUNKER OR OTHER DEDUCTIONS FROM THE FIRST HIRE INSTALMENT.

PRICES BENDS: USD 503 PMT HSIFO AND USD 740 PMT MDO.

OWS TO HAVE THE RIGHT TO BUNKER THE VSL PRIOR REDELY UNDER THIS
CHARTER PROVIDED SAME DOES NOT INTERFERE WITH CHRTS

OPERATIONS.

DURING SERVICE CHRTS ALWAYS TO ARRANGE BUNKERING TO TAKE PLACE  INSIDE
PORT LIMITS OR AT A SAFE USUAL BUNKER ANCHORAGE

AND CHRTS  NEVER TO ATTEMPT TO PLACE BUNKERS IN THE VSL OUTSIDE PORT
LIMITS  OR IN HIGH SEAS.

MASTER WILL REPORT TO CHRTRS SHIP'S MOVEMENTS DURING SCHEDULED CALL TO
SINGAPORE. ALL TIME USED FOR THE BUNKER CALL AT

SINGAPORE AT CHRTRS' TIME.

-IN CASE ORIGINAL BS/L NOT AVAILABLE PRIOR TO VSLS ARRIVAL AT  DISPORT,
OWS TO ALLOW DISCHARGE/DELIVERY OF THE CGO AGAINST CHRTS'

L.O.I. IN OWS P+I CLUB STANDARD WORDING ISSUED ON THE CHTRS  LETTER
HEAD AND STAMPED/SIGNED BY A DESIGNATED OFFICIAL OF THE  CHTRS ONLY,
WITHOUT BANK COUNTER SIGNATURE.

THE CHTRS WILL FAX THE L.O.I. TOGETHER WITH COPY OF THE BS/L WHICH
WILL BE ISSUED TO OWS MANAGERS' OFFICE IN GREECE(FAX NR.210-8090305)
FOR THEIR APPROVAL. THEREAFTER THE CHTRS WILL IMMEDIATELY SEND BY
COURIER MAIL THE ORIGINAL L.O.I., FAXING ALSO THE COURIER AIRWAY  BILL
TO OWS MANAGERS.

THIS PROCEDURE TO TAKE PLACE PROMPTLY ENOUGH PRIOR TO VSL'S ARRIVAL  AT
DESTINATION, BEING UNDERSTOOD THAT THE OWS WILL INSTRUCT THE  MASTER TO
RELEASE THE CARGO ONLY AFTER HAVING FOUND ALL IN ORDER  AND AFTER HAVING
RECEIVED CHTRS FAX WITH THE COURIER AIRWAY BILL.

FURTHERMORE CHTRS HEREBY UNDERTAKE THE OBLIGATION TO MAIL THE  ORIGINAL
ACCOMPLISHED BS/L TO OWS MANAGERS WHEN SAME AVAILABLE BUT  LATEST WITHIN
2 MONTHS AFTER REDELIVERY IN WHICH CASE OWS/MANAGERS  WILL COURIER BACK
TO CHTRS THE L.O.I.

-WHERE THE VESSEL REMAINS AT ANCHORAGE, IN PORT OR IDLE FOR AN  EXTENDED
PERIOD IN COMPLIANCE WITH CHRTRS' ORDERS/INSTRUCTIONS,  AND THIS CAUSES
FOULING OF THE HULL OR UNDERWATER PARTS, OWNERS  SHALL NOT BE
RESPONSIBLE FOR SUCH FOULING OR ANY VESSEL  UNDERPERFORMANCE CAUSED BY
SUCH FOULING. THE COST OF CLEANING  AND PAINTING THE HULL OR UNDERWATER
PARTS, AND THE TIME SPENT  DOING SO, SHALL BE FOR CHARTERERS' ACCOUNT.

-CHTRS GTEE THAT THEY ARE FULLY COVERED WITH A FIRST CLASS P+I CLUB
INCL CARGO CLAIMS, F/D+D (FREIGHT/DEMURRAGE+DEFENCE) AND FULL CHTRS
LIABILITY AND WILL REMAIN SO FOR THE TOTAL DURATION OF THE PRESENT
CHARTER. CHTRS P+I CLUB IS:RAETS

-BIMCO ISM CL AND ISPS/MTSA CL AND FUEL SULPHUR CONTENT CL 2005  AND
BIMCO DOUBLE BANKING CL TO BE INCORP IN THIS CP

-3.75PCT ADCOMM + 1.25PCT LSS  + 1.25PCT CARDIFF MARINE INC

-OTHERWISE AS PER ATTACHED C/P MV BRISBANE/SWISSMARINE DD 26/9/2007 WITH ₤
LOGICAL AMMENDMENTS AS PER MAIN TERMS AGREED ONLY

End


Many thanks for your very nice support leading to this fixture.


Best regards

LSS - SA

Luc Van Mael

direct line: + 32 3 401 00 28

mobile    : + 32 475846160


###############################################################
This e-mail and any attachments may contain confidential and
privileged information. If you are not the intended recipient,
please notify the sender immediately by return e-mail, delete this
e-mail and destroy any copies. Any dissemination or use of this
information by a person other than the intended recipient is
unauthorized and may be illegal.

This mail has been checked and is free of virus.
###############################################################

CharSet:
=== MESSAGE ADDRESSEES
To: DryBulk <chartering@drybulk.gr>;
    chartering@shourong.com, yuqiang@shourong.com
Cc: ;

=== MESSAGE INFORMATION: [size: 1176948 bytes] [0] [M]

| ATTACH | B HTM | FN=- | A | 26 KB 7 | 2 |
| ATTACH | BIN | FN=IMG2IM.TIF | - | 1 MB 7 | 3 |

=== END
|=================================================================

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 **This Charter Party**, made and concluded in ....London.................................................26th day of *September*..............19 *2007* ⚓

2 Between *TROJAN MARITIME COMPANY, MARSHALL ISLANDS* .................................................................

3 Owners of the good *Maltese flag*..............................Steamship/Motorship *'BRISBANE' - See* Description Clause 29 of ...

4 of.....................................tons gross register, and.......................tons net register, having engines of...................indicated horse power

5 and with hull, machinery and equipment in a thoroughly efficient state, and classed ...........................................................

6 at..................................of about......................cubic feet bale capacity, and about....................tons of 2240 lbs.

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8 allowing a minimum of fifty tons) on a draft of.....................feet.................inches on....................Summer freeboard, inclusive of permanent bunkers,

9 which are of the capacity of about................................................tons of fuel, and capable of steaming, fully laden, under good weather

10 conditions about..................................knots on a consumption of about..................tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,

11 now.......................................................................................................................................................................

12 .................................................and *SWISSMARINE SERVICES S.A.* .......................Charterers of the City of *GENEVA*. ⚓

13 **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 about *One Timecharter trip of one laden leg only via safe anchorages/safe berths/safe ports, always accessible, always afloat,*

15 *always within Institute Warranty Limits - Indonesia or Richards Bay to Continent/Mediterranean with lawful, harmless bulk*

*cargo which to be loaded/stowed/carried/discharged in accordance with IMO recommendations and/or any other local/national*

*regulations and always in conformity with vessel's class certificate requirements - sole cargo allowed: harmless coal in bulk -*

*duration about 50/55 days,* within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfillment of this Charter Party.

18 Vessel to be placed at the disposal of the Charterers, at .. *on dropping last outward sea pilot safe port QINGDAO/BEILUN range (Intention*

19 *HAILI), port in Owners' option, any time day or night, Sundays and holidays included,* .......................................................

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be

22 ready to receive cargo with clean swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 dise, including petroleum or its products, excluding

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29 Mexico, and/or South America .......................................................................................................and/or Europe

30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31 October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

32 *Trading always via safe ports, safe anchorages, safe berths within Institute Warranty Limits - See also Clause 98 -*

33

34 *Cargo will be loaded/stowed/carried and discharged in accordance with IMO recommendations and cargo to be loaded in all*

35 *and/or alternate holds in accordance with vessel's stress/stability,*

as the Charterers or their Agents shall direct, on the following conditions:

36    1.    That the Owners shall provide and pay for all provisions, *fresh water,* wages and consular shipping and discharging fees of the Crew; shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38 the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service. *See Clauses 32, 63 and 75.*

39    2.    That *whilst on hire,* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory/customary*

*and Baltic Sea, Dardanelles/Bosphorus, Great Barrier Reef, Torres Strait, Japanese Inland Sea* Pilotages, Agencies, Commissions and

*compulsory garbage removal,*

40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41 a port for causes for which *Owners*/vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43 charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44 of six months or more.

45    Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46 Owners to allow them the use of any *equipment*/dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47 for dunnage, they making good any damage thereto.

48    3.    That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49 board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than.......................tons and not more than

50 ~~.......tons and to be re-delivered with not less than.......tons and not more than.......tons.~~ *See Clause 36.*

51     4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of *See Clause 37* ...................................

52 ~~.......United States Currency, per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53 ~~stores, on .......summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at

54 and after the same rate for any part of a ~~month~~ *day;* hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) at .......*on dropping last outward sea pilot or on passing Cape Passero range, port in*

56 *Charterers' option, (intention: Rotterdam), any time day or night, Sundays and holidays included,* unless otherwise mutually agreed.

57 Charterers are to give Owners not less than .................................................................................................................... days

notice of vessels expected date of re-delivery, and probable port.

58     5.    Payment of said hire to be made ~~in New York in cash in United States Currency, semi-monthly~~ *15 days* in advance, and for the last *15 days* ~~half

59 month or~~ part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers. ~~; otherwise failing the punctual and regular payment of the~~

61 ~~hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-~~

62 ~~terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day~~

63 ~~following that on which written notice of readiness has been given to Charterers before 4 p.m., but if required by Charterers, they~~

64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~ *See Clauses 37 and 40.*

65     Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68     6.    That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70 ~~lie aground.~~

71     7.    That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74 ~~paying Owners .......per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75 ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

76     8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, ~~and~~ trim *and discharge* the cargo at their expense under the supervision of the Captain, who is to *authorise

7a Charterers or their Agents* to sign Bills of Lading for

79 cargo as presented, in conformity with Mate's ~~or Tally Clerk's~~ receipts, *without prejudice to this Charter Party. (See also Clause 48).*

80     9.    ~~That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on~~

81 ~~receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.~~

82     10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84 rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying at the ~~current~~ rate *of U.S.$5.00* per meal, for all such victualling.

86     11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, *in English language,* showing the course of the vessel

and distance run and the con-

89 sumption of fuel.

90     12.    That the Captain shall use diligence ~~in caring~~ for the *care and* ventilation of the cargo. *Vessel's holds are naturally ventilated only.*

91     13.    ~~That the Charterers shall have the option of continuing this charter for a further period of ..............................................................~~

92 ...........................................................................................................................................................................................

93 ~~on giving written notice thereof to the Owners or their Agents .......days previous to the expiration of the first-named term, or any declared option.~~

94     14.    That if required by Charterers, time not to commence before *00:01 hours local time 10th October 2007* ........................... and should vessel

95 not have given written notice of readiness on or before *24:00 hours local time 20th October 2007* ~~but not later than 4 p.m.~~ Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97     15.    That in the event of the loss of time from *default and/or* deficiency of men, *including strike of Officers and/or crew* or *deficiency of*

98 stores, fire, breakdown or damages to hull, machinery or equipment,

99 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause *whatsoever*

100 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

101 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

thereof, and all extra expenses shall be deducted from the hire.

102     16.    That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106 purpose of saving life and property.

107     17.    ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~

108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~

109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

110     18.    That the Owners shall have a lien upon all cargoes, and all sub-freights/*sub-hires* for any amounts due under this Charter, including General Aver-

111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113 might have priority over the title and interest of the owners in the vessel.

114     19.    That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115 Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116 York-Antwerp Rules *1994 or any amendments thereto in London* ~~1924, at such port or place in the United States as may be selected by the carrier,~~
and as to matters not provided for by these

117 Rules, according to the laws and usages at the port of ~~New York~~ *London.* ~~In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~ *Hire shall not contribute to General Average.*

126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~ *See Clause 75.*

132 ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~

133 20. ~~Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~
134 ~~cost of replacing same, to be allowed by Owners.~~

135 21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 *See Clause 82.* ................................................................................................................................................................................
139 ...................................................................................................................................................................................................................

140 22. ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~
143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~
~~Charterers to have the use of any gear on board the vessel.~~ *Special gear for loading or discharging operations (such as fenders, etc.) to be*
*for Charterers' account. Charterers to have free use of lights on board for night working.*

145 23. ~~Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~

151 24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~

155 ~~U.S.A. Clause Paramount~~ *See Clause 81*
156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 ~~Both-to-Blame Collision Clause~~ *See Clause 87*
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~

167 25. The vessel shall not be required to *force ice or follow ice breakers or* enter any ice-bound port, or any port where lights or light-ships have
been or are about to be with-
drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
port or to get out after having completed loading or discharging.

170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, insurance, crew, *act of tugboat* and all other matters, same as when trading for their own account.

172 27. A *brokerage* commission of *1.25* ~~2-1/2~~ per cent is payable by the Vessel and Owners to *THURLESTONE SHIPPING LIMITED* plus
173 *1.25 per cent to CARDIFF MARINE INC.*
174 on the hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175 28. An address commission of *3.75* ~~2-1/2~~ per cent payable to *Charterers* .................................................... on the hire earned and paid under this Charter.

*Additional Clauses 29 to 107, both inclusive, are deemed to be fully incorporated.*


**THE OWNERS:**                              **THE CHARTERERS:**

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

### ADDITIONAL CLAUSES TO THE CHARTER PARTY
### M/V 'BRISBANE'
### DATED LONDON   26TH SEPTEMBER 2007

29.    Vessel's Description:

MV 'BRISBANE'
ALL DETAILS 'ABOUT'
GEARLESS BULK CARRIER - MALTA FLAG - BLT 1995
DWAT 151,066 MT ON ABT 17.419M SSW DRAFT
LOA/BEAM 273M/43M
GT/NT 77,298/48,787
AHL FTTD - NOT GRAIN CLEAN
9 HO/HA - GRAIN BSS 100PCT ABT 167,715 CBM
HOLD CUBICS:
1) 16,881
2) 19,256
3) 19,398
4) 19,398
5) 19,149
6) 18,993
7) 19,249
8) 18,910
9) 16,481 ALL CBM
HATCH SIZES: NO.1: 14,195X18,40M - NOS 2/3/4/5/6/8: 14,195X19,80M
        NO.9: 14,195X14,00M
HATCH COVERS SIDE ROLLING
SPEED/CONSUMPTION:
BALLAST ABT 15,25KN ON ABT 55 LT IFO 380CST+ABT 0,5LT MDO DISTILLATE
LADEN ABT 13,70KN ON ABT 55,5 LT IFO 380CST+ABT 0,5LT MDO DISTILLATE
ABOVE SPEED/CONS ALWAYS UNDER GOOD WEATHER CONDITIONS UPTO
BEAUFORT FORCE 4 AND DOUGLAS SEA STATE 3 WITH NO ADVERSE CURRENT
AND NO NEGATIVE INFLUENCE OF SWELL.
PORT CONSUMPTION, IDLE ABT 3LT IFO 380CST+ABT 2LT MDO DISTILLATE
PLUS ABT 2,5LT IFO 380 CST+ABT 2LT MDO WHEN BALLASTIN/DEBALLASTING.
DURING ROUGH SEAS VSL BURNS 2,5LT MDO DAILY AND IFO DAILY CONSUMPTION
IS RESPECTIVELY REDUCED.
BUNKERS SUPPLIED BY CHRTRS TO BE: IFO RMG 380, MDO DMB OR DMA
AS PER ISO 8217:2005
VESSEL TO HAVE LIBERTY OF USING MDO DISTILATE AT START/STOP/SWITCH
GENERATOR ENGINE AT SEA, WHEN ENTERING/LEAVING PORT, MANEUVERING
IN SHALLOW/NARROW WATERS, CANALS, RIVERS AND AT OTHER LIMITED
OCCASIONS.

30.    Cargo:

Sole cargo allowed:  Harmless coal in bulk.

The cargo will be  loaded/stowed/carried and discharged in accordance with IMO recommendations and/or
any other local/national regulations and always in conformity with vessel's class certificate requirements.
Cargo to be loaded in all and/or alternate holds in accordance with vessel's stress/stability.

2

31.     Delivery/Redelivery Notice:

On fixing Owners to give a notice of vessel's delivery to Charterers with intended port as soon as available. Charterers to give 30/20/15/10/7/5/3/2/1 days notice of redelivery to Owners, together with intended port as soon as available.  Also upon request by Charterers/Owners, respectively to provide latest itinerary from time to time.

32.     Owners' Expenses:

Owners also to  provide and pay all expenses  of officers and crew, including immigration fees and  also all consular fees necessitated because of vessel's flag or nationality of Owners and  also lubricating oils.

33.

Deleted.

34.     Hold Cleaning:

All holds on arrival at Charterers' first load port to be clean swept and dried up in every respect to load Charterers' intended cargo and to pass relevant surveyors'/authorities' inspection.  If holds  fail to pass such inspection, vessel to be put off-hire until reinspection passed.  It is however understood and agreed that should holds partially fail such inspection and loading operations take place in those holds passed then, in case there is loss of time for Charterers, the vessel will be placed off-hire pro rata to the number of holds rejected only.

However, Charterers shall have the right to redeliver the vessel with cargo compartments, as left by Stevedores and Charterers shall pay USD7,500 lumpsum (on redelivery) in lieu of hold cleaning, excluding removal of debris, etc., which Charterers confirm will remove from the ship prior redelivery.

35.

Deleted.

36.     Bunkers on Delivery and Redelivery:

Bunkers on delivery to be about  1,850/2,050  MTS IFO and about 110/125  MTS MDO.  Bunkers on redelivery to be about the same quantities as actually on delivery.  Charterers to take over and pay value of bunkers on delivery together with the first hire payment.  No bunker or other deductions from the first hire installment.  Prices both ends:  USD398.00 per MT for IFO and USD665.00 per MT for MDO.

Owners to have the right to bunker the vessel  prior redelivery under this Charter provided same does not interfere with Charterers' operations.

3

Charterers to have the same option prior to delivery provided same not interfering with Owners' operations.

During service Charterers always to arrange bunkering to take place inside port limits or at a safe usual bunker anchorage and Charterers never to attempt to place bunkers in the vessel outside port limits or in high seas.

37.     Charter Hire (Ref. Clause 4 & 5):

a.     Hire Rate: U.S.$ 95,000 (Ninety Five Thousand Dollars)  per day/pro rata for first 52 days and U.S.$150,000 (One Hundred and Fifty Thousand Dollars) per day/pro rata for balance of Charter, including overtime to be paid every fifteen days in advance to Owners' nominated bank.

b.     Payment of Charter hire shall be made in U.S. Dollars in cash or by telegraphic transfer 15 (fifteen) days in advance for the account of Owners at the following bank:

       HSH NORDBANK AG
       HAMBURG
       GERMANY
       BENEFICIARY: TROJAN MARITIME CO.
       SWIFT : HSHNDEHHXXX
       ACC NR : 1100335846
       IBAN NR: DE27210500001100335846
       (THROUGH: JP MORGAN CHASE BANK N.Y. SWIFT : CHASUS33)

       See also Clause 40.

38.     Joint Survey:

At delivery port a joint on-hire bunker/condition survey to be conducted in Owners' time except in case vessel is rendering service to Charterers and expenses to be equally shared between Charterers and Owners. A joint off-hire survey for the purpose of determining vessel's condition, equipment, quantities of bunkers on board shall be held at the port of redelivery in Charterers' time.  The expenses of such survey shall be equally shared between Owners and Charterers.

39.     Withholdings:

Charterers shall have the right to deduct from Charter hire during the period of Charter the undisputed portion of any claim for vessel's off-hire or for under-performance and actual or estimated Owners' disbursements, which not to exceed USD1,000 per port, unless specifically requested to do so by Owners. Appropriate statements/vouchers shall be submitted when available and adjustments finalized as soon as possible thereafter.

Last hire payments:
Charterers also have the liberty to withhold from last hire payment(s) sufficient funds to cover:

1.     The value of estimated bunkers remaining onboard at the time of redelivery;
2.     Deleted.
3.     Estimated Owners' disbursements,
4.     Any advances made to Owners and/or the vessel's Master.

4

40.    Banking Delays:

In the event of default in payment of hire in Clauses 5 and 37, Owners shall notify Charterers in writing of such default, whereupon Charterers shall arrange payment, without interest, within three (3) banking days in London and New York.

It is agreed that the hire is to be considered correctly paid upon Charterers' Bankers having irrevocably remitted the hire to Owners' Bankers as stated in Clause 37b. Otherwise, failing to do so, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers.

41.    Breakdown, Accident and Drydocking:

Should the vessel be put back whilst on voyage by reason of an accident or breakdown, or in case of drydocking pursuant to Clause 82, or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the crew or any person onboard the vessel (other than Charterers' supercargo and/or other persons travelling by request of the Charterers), the hire shall be suspended from the time of the inefficiency until the vessel is efficient in the same or equivalent position and the voyage resumed therefrom. All extra expenses incurred, including bunkers consumed during period of suspended hire, shall be for Owners' account.

42.    Seizure/Arrest/Requisition/Detention:

Should the vessel be seized, arrested, requisitioned or detained during the currency of this Charter Party by any authority or at the suit of any person having or purporting to have a claim against or any interest in the vessel, the Charterers' liability to pay hire shall cease immediately from the time of her seizure, arrest, requisition or detention and all time so lost shall be treated as off-hire until the time of her release. Any extra expenses incurred by and/or during above seizure, arrest, requisition or detention are to be for Owners' account.

If such seizure, arrest, requisition or detention extends for a period of sixty (60) days or more, or in case vessel undergoes a scheduled repair or by reason of an accident or breakdown resulting to a loss of time for a period of ninety (90) days or more, Charterers shall have the right to cancel the balance of the Charter by giving Owners written notice of cancellation.

This Clause is inoperable should the seizure, arrest, requisition or detention be occasioned by any act, omission or default of the Charterers or their Agents or by reason of the cargo so carried.

43.    Insurance Premium Benefit:

Charterers shall have the benefit of return insurance premium, if any, receivable by Owners from the underwriters by reason of the vessel being in port for a minimum of thirty (30) consecutive days. The Charterers shall be entitled to such benefit for all time on-hire during the period for which insurance premium is refundable.

5

**44.     Stevedore Damage:**

Stevedores to be appointed and paid by the Charterers but to work under the supervision of the Master. The Charterers shall be responsible for any damage to the vessel, or loss or damage to its equipment caused by stevedores during the currency of this Charter Party provided the Master has reported to the Charterers or their Agents within 24 hours from the discovery of the damage(s). If practicable, the Master to endeavour to obtain written acknowledgement from the party responsible for the cause of the damage.

The Charterers shall have the liberty to redeliver the vessel without repairing the damages for which the Charterers are responsible, as long as the same does not affect the vessel's seaworthiness and/or class, but the Charterers undertake to reimburse costs of repairs against production of repairs estimated by repairers or dock-yard unless otherwise agreed. Should stevedores' damage to the vessel or her fittings affect vessel's seaworthiness and/or class, then Charterers to arrange an immediate repair at class surveyor's satisfaction at their time, costs and expenses.

**45.     Grab Discharge:**

The vessel shall be suitable for grab discharge and no cargo shall be loaded in places inaccessible to grabs. Charterers have the privilege of using bulldozers with rubber wheels in vessel's holds provided weight of bulldozers does not exceed tanktop strength.

**46.     Crew/Strike/Boycott:**

Should the vessel be boycotted, picketed, blacklisted or similar incident at any port or place by shore and/or port labour and/or tugboats and/or pilots, and/or competent authority, by the terms and conditions on which the members of the Officers, crew were employed, any direct extra expenses incurred by Charterers at such port or place therefrom are to be for Owners' account and Charterers are entitled to put the vessel off-hire for any time lost.

**47.     I.T.F. or Equivalent:**

Owners warrant that throughout the Charter the vessel shall have onboard a valid ITF or equivalent certificate and/or that the vessel's Officers and crew wages and conditions of employment shall enable the vessel to trade worldwide without interference from the ITF or equivalent at any port of call.
Vessel's Blue Card number is:

**48.     Bills of Lading:**

In case original Bills of Lading are not available prior to vessel's arrival at discharging port, Owners to allow discharge/delivery of the cargo against Charterers' Letter of Indemnity in Owners' P+I Club standard wording issued on the Charterers' letter head and stamped/signed by a designated official of the Charterers only, without bank counter signature.   The Charterers will fax the Letter of Indemnity together with copy of the Bills of Lading which will be issued to Owners' managers' office in Greece (Fax nr.210-8090305)  for their approval.  Thereafter the Charterers will immediately send by  courier mail the original Letter of Indemnity, faxing also the courier airway  bill to Owners' managers.

6

This procedure to take place promptly enough prior to vessel's arrival at destination, being understood that the Owners will instruct the master to release the cargo only after having found all in order and after having received Charterers' fax with the courier airway bill. Furthermore Charterers hereby undertake the obligation to mail the original accomplished Bills of Lading to Owners' managers when same available but latest within 2 months after redelivery, in which case Owners/managers will courier back to Charterers the Letter of Indemnity. This Clause applies accordingly in case of changing destination/port other than that of Bills of Lading.

Discharge ports shown on Bill of Lading do not constitute a declaration of discharge port and Charterers have the right to order the vessel to other ports within the terms of this Charter Party against Charterers' Letter of Indemnity in Owners' P&I format without bank guarantee/endorsement. If required by the Charterers, Owners agree to discharge the cargo at different port. Charterers and/or their agent are allowed to issue/sign sea waybills in lieu of Bills of Lading only for Japan discharge provided marked 'subject to Hague Visby Rules'.

49.    Suez Canal:

Subject to vessels of this size being permitted by the Canal Authorities to transit the Suez Canal, Owners undertake that throughout the period of set under this Charter Party, they shall comply with the regulations in force so as to enable the vessel to pass through the Canal by day and by night, without delay upto maximum Canal drafts without the assistance of tugs, unless required by Suez Canal Authorities. Tug assistance necessary due to vessel's proven deficiency/inefficiency shall be for Owners' account.

50.    Communications:

The Master, senior officers and the radio officer/operator, if any on board, shall be fully conversant in the English language.

51.    Smuggling:

Any delay, fines, expenses and/or time incurred on account of smuggling shall be for Owners' account, unless proven to be instigated by Charterers and/or persons appointed by Charterers.

52.

Deleted.

53.    Certificates:

The Owners warrant that the vessel shall throughout the currency of the Charter Party be in possession of valid classification and trading certificates and any other documentation required to permit the vessel to trade world-wide without hindrance. Failing which all costs, expenses and loss of time occasioned by non-compliance to be for Owners' account.

7

54.    Compliance with U.S. Safety and Health Regulations:

If the vessel calls at any U.S. port for the purpose of loading or discharging cargo, the vessel's equipment shall comply with regulations established under U.S. Public Law 85-742 Part 9 (Safety and Health Regulations for Longshoring) or any subsequent amendments. If longshoremen are not permitted to work due to the failure of the Master and/or Owners to comply with the aforementioned regulations, any delay to the vessel resulting therefrom shall be for Owners' account.

55.    War:

In the event of war or warlike operations involving Japan, United States of America, Australia, E.U. countries, C.I.S., People's Republic of China, or the nation under the flag of which the vessel performing under this Charter Party is registered, which seriously and directly affects Charterers' or Owners' ability to perform their obligations under this Charter Party, Charterers and Owners shall have the right to suspend this Charter Party with three (3) weeks written notice.
If the Charter Party is suspended, such suspension shall take place at port of destination after discharging of any cargo onboard, subject to the provisions of Conwartime 2004.

56.    War Risk Insurance:

Basic annual war risk premium is to be for Owners' account, but net additional premium including blocking and trapping for trading to areas in breach of the war risk warranties, is to be for Charterers' account. Owners to provide Charterers with original supportive vouchers from insurance brokers, and provided that full documentation is provided by Owners, showing all rebates applicable.
Additionally, Charterers to reimburse Owners for extra crew expenses and crew bonus, if any.

57.    Off-Hire Extension:

Deleted.

58.    Arbitration:

All disputes arising out of this contract which cannot be amicably resolved shall be referred to arbitration in London. Unless the parties agree upon a sole arbitrator, the reference shall be to a tribunal of three arbitrators, one to be appointed by each of the parties and the third by the two so chosen. The arbitrators shall be members of the London Maritime Arbitrators' Association or otherwise qualified by experience to deal with commercial shipping disputes.
The contract is governed by English Law and there shall apply to arbitration proceedings under this Clause the terms of the London Maritime Arbitrators' Association current at the time when the arbitration proceedings are commenced.

In case of a dispute where the total amount claimed by either party does not exceed the amount of USD50,000 (Fifty Thousand Dollars), the arbitration shall be conducted in accordance with the Small Claims Arbitration Procedure of the London Maritime Arbitrators' Association.

8

59.     Benefit of Owners' P+I Club:

Charterers shall have the benefit of Owners' Protection and Indemnity Association as far as the Club rules permit.
See also Clause 78.


60.     Ocean Route/PECA Clause:

Charterers have the right to use weather routing service for monitoring vessel's route and performance. Charterers to nominate the weather routing service but Owners to appoint them on Charterers' request. Cost to be shared between Charterers and Owners. In case of discrepancy between the weather routing service date and Master's deck logs, then the weather reports of national shore weather stations to apply as to the weather and admiralty ocean pilot charts to apply as to the current factor. AWT always excluded.


61.     Financial Responsibility in Respect of Oil Pollution:

1.      Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

A)      Certificates issued pursuant to Section 311 (P) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S. Code Section 1321 (P)) up to (insert the date upon which such certificate(s) is/are due to expire).

B)      Certificates issued pursuant to Section 1016(A) of the Oil Pollution Act 1990, and Section 108(A) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph (A) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme(s)).

2.      Notwithstanding anything whether printed or typed herein to the contrary,

A)      Save as required for compliance with paragraph (1) hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

B)      Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

C)      Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bill of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

9

62.    Inspection:

Deleted.


63.    Taxes:

All taxes on cargo or voyage freights to be for Charterers' account, except income tax and taxes on time charter hire levied in the country of the vessel's flag and/or her Owners' domicile. All dues, duties, charges and/or taxes on crew, and/or stores to be for Owners' account. (See Clause 1.)


64.

Deleted.


65.    Vessel's Gear:

Vessel shall work day and night, if required by Charterers. Any overtime charges for officers and crew to be for Owners' account. If the vessel's means for opening and closing hatches becomes inoperative, the vessel shall be off-hire. Such off-hire shall be calculated pro rata to the number of inoperative hatches and shall count only if ship's loading or discharging is actually delayed.


66.    Hatches:

Crew shall open and close hatches before, during and after stevedores' work when and where required and when permitted by shore regulations.


67.    Freshwater:

Fresh water consumed under this Charter Party by stevedores and/or for Charterers' business in excess of vessel's fresh water generating capacity shall be for Charterers' account.


68.    Deviation:

Vessel shall have the liberty to deviate for the purpose of saving life and/or property and to tow and assist vessels in distress, such operation shall not be deemed to be a deviation under this Charter Party but all salvage attribution thus payable to the vessel shall be equally divided between Charterers and Owners after proper deduction of expenses, if any (including Master's, Officers', crew's share), incurred in this respect.

10

69.    Blacklist:

Owners warrant that at the commencement of this Charter Party, the vessel is not blacklisted by the United States of America and/or Canadian authorities and/or Longshoreman Associations nor by Scandinavian, Australian, South African authorities.

70.    Watchmen:

Watchmen shall be for Owners' account unless compulsorily required by port regulations or by Charterers and/or their agents.

71.    Notices:

All notices, requests, demands or other communications permitted or required to be given under or in connection with this Charter shall be given by the Owners and the Charterers by cable, telex (with confirmed answerback), tele-facsimile or registered letter, to the other party, as provided below, effect upon receipt, or to such other address as either party may specify to the other party by notice given pursuant to this Clause:

Via:    Thurlestone Shipping Ltd.,
        Tel:  0207 618 6570
        Email:  chartering@thurlestone-shipping.com

72.    Owners' Agents:

Whilst on this Charter, Charterers agree that Owners shall be able to use Charterers' agents for usual Owners' matters, such as crew's medical treatment, shore pass, dispatching and/or delivery mail and/or telegrams, ordering small repairs and/or purchasing ship's supplied, provided said agents are willing and able to do so with Owners paying the actual costs for such matters without paying an additional agency fee.

However, as to major Owners' matters, such as crew repatriation, hospitalisation, ship's accident and drydocking, etc., Owners shall appoint their own agents to attend to such matters and shall be responsible for funding the agents accordingly. In case Owners are unable to arrange same, Charterers shall permit their agents to attend to such matters with Owners paying Charterers' agents the actual expenses involved and the agency fee according to the agents' tariff rate. (See also Clause 5).

73.    Charterers' Expenses Paid by Owners:

Charterers shall pay the Owners a lumpsum of USD1,500 per month or pro rata in consideration of vessel's communication costs on Charterers' business and the expenses of complementary entertainment of port officials, etc., disbursed by Owners.

74.    P & I:

The vessel shall have onboard a P+I Club Certificate.

11

75.    Owners' Bunker Consumption:

Bunkers consumed during any period the vessel is off-hire for whatever cause shall be reimbursed by Owners at major suppliers' price at next port of replenishment.
See Clause 1.


76.    Pratique:

The vessel shall prepare radio pratique when instructed by the Charterers and shall be in possession of necessary certificates. Charterers' agents shall, as the vessel's trading pattern allows, properly direct the Master regarding the port authority's requirements prior to the vessel's arrival at each port of call.


77.    Vaccination Certificates:

Owners shall be responsible for and arrange at their own expense for the Master, Officers and crew to be vaccinated and to be in possession of valid vaccination certificates throughout the period of this Charter. Any time lost or additional expenses incurred due to failure to provide such certificates shall be for Owners' account.


78.    P+I Association:

Owners warrant that throughout the currency of this Charter Party, the vessel shall be fully covered for insurance, including cargo claims, by  a leading Protection and Indemnity Association, as provided by the rules of such association.  Such cover shall be at the sole expense of Owners.

If required by the Charterers, prior to commencement of the Charter or at any other time, the Owners shall procure that the Managers of the Protection and Indemnity Association shall confirm to the Charterers, provided same allowed under the policy of the Club,  in writing that the vessel is fully covered by the Owners and that all calls have been paid up to date.
If Owners fail to maintain P+I cover as provided for in this Clause in the manner described, the Charterers may place equivalent insurance at Owners' expense and deduct the cost of such insurance from the vessel's hire.  See also Clause 59.
Owners' Protection and Indemnity Association is:


79.    Queensland Tug Clause:

Deleted.


80.    Bills of Lading Clauses:

The New Jason Clause (Clause 86), the Both-to-Blame Collision Clause (Clause 87), the Conwartime 2004 (Clause 88)  shall be incorporated in this Charter Party and the  General Clause Paramount (Clause 81) and P. and I. Bunkering Clause shall be contained in all  Bills of Lading issued hereunder.

12

81.    General Clause Paramount:

The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 24th August 1924 ("The Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 ("The Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may   only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment  or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.

The Protocol signed at Brussels on 21st December 1979 ("The SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier.

82.    Drydocking:

No drydock except in emergency.

83.    Vessel's Plans:

Upon delivery of the vessel, Owners shall provide Charterers with copies of the vessel's capacity plan, general arrangement plan and deadweight scale.

84.

Deleted.

85.    Pestilence and Illness:

Normal quarantine time and expenses to enter port shall be for Charterers' account.  Any extra time or detention and/or expenses for quarantine due to pestilence and illness of the vessel's Master, Officers and crew shall be for Owners' account but if quarantine detention is due to the vessel having been sent by Charterers to an infected port, such detention time and expenses shall be for Charterers' account.

13

86.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:-

### New Jason Clause

'In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

Charterers shall ensure that all Bills of Lading issued under this Time Charter Agreement shall contain or incorporate by reference this 'General Average and New Jason Clause'.

87.    **BOTH-TO-BLAME COLLISION CLAUSE**

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:-

### Both-to-Blame Collision Clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

The Charterers shall procure that all Bills of Lading issued under this Charter Agreement shall contain or by reference incorporate the above 'New Both to Blame Collision Clause'.

88.    War Risks Clause for Time Charters, 2004 (Code Name: CONWARTIME 2004)

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

14

(ii) "War Risks" shall include any actual, threatened or reported:
war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-
(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

15

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

89.

Deleted.

90.    Titles:

The titles to clauses and sub-clauses of this Charter Party shall not in any way affect the interpretation thereof.

91.    Law:

This agreement shall be construed in accordance with English Law.

92.    Cargo Claims:

Cargo claims, if any, to be settled in accordance with NYPE Interclub agreement of September 1996 and its amendments thereto.

16

93.    Ice-Free Ports/Trading:

Vessel not to be required to force ice nor to follow ice-breaker(s). This is a condition precedent to Charterers' option of breaking IWL against payment of insurance premium per Lloyds of London scale provided Owners' prior consent obtained, such consent not to be unreasonably withheld.

94.    Time:

Delivery and redelivery time to be based on G.M.T.

95.

Deleted.

96.    Delivery Notices:

Owners shall give Charterers notice of vessel's delivery on fixing and port, immediately advising Charterers of any change in intended delivery port.
See Lines 18 and 19.

97.    BIMCO ISM Clause:

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for Owners' account.

98.    Trading:

Always within Institute Warranty Limits with lawful trade, always afloat and always via good safe berths/ ports/ anchorages which to be entirely suitable for this size/description of vessel and where vessels of similar size/ description regularly trade.

Notwithstanding the above always excluding:
Iceland, Sweden, Finland , Norway, Denmark, Canada, Libya including Gulf of Sidra/Sirte, Lebanon, Syria, former Yugoslavia but Croatia and Slovenia allowed, Albania, Turkish occupied Cyprus, Azov Sea, Somalia, Gulf of Aqaba, Ethiopia, Iran, Iraq, Israel, Eritrea, Angola including Cabinda, Namibia, CIS Pacific, Liberia, Nigeria, Cambodia, North Korea, Haiti, Cuba, Yemen, Sudan, Sri Lanka, Georgia including Abkhazia, Hokkaido, Orinoco River, Nicaragua, Sierra Leone, Democratic Republic of Congo (formerly Zaire), Murmansk, Alaska, Amazon River, any war and/or warlike areas/any countries to which U.S.A./U.N. sanctions from time to time are imposed.

17

If Charterers trade to ports/areas where additional ropes/wires/winches/drums etc., are necessary over and above that as on board, then same to be for Charterers' account.

No direct trading between P.R.C. and Taiwan.


99.    Change of Flag/Ownership:

Owners shall have the right to change vessel's flag and/or crew and/or ownership and/or class and/or technical management at any time during the currency of this Charter Party, but always subject to Charterers' approval which not to be unreasonably withheld. Such change(s) are not, in any way, to hinder, prevent or detract from Charterers' rights and ability to use the vessel according to present Charter Party terms.


100.    Mobile Cranes Clause:

Deleted.


101.    **BIMCO DOUBLE BANKING CLAUSE**

(A)    The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(B)    The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(C)    Without prejudice to the generality of the Charterers' rights under (A) and (B), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (A) and (B) if in his reasonable opinion it is not safe to do so.

(D)    The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

(E)    The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.


102.    Excessive Delays in Port:

Where the vessel remains at anchorage, in port or idle for an extended period (means excess 20 days) in compliance with Charterers' orders/instructions, and this causes fouling of the hull or underwater parts, Owners shall not be responsible for such fouling or any vessel under-performance caused by such fouling. The cost of cleaning and painting the hull or underwater parts, and the time spent doing so, shall be for Charterers' account.

18

103.    Hamburg Rules Charter Party Clause:

Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, Waybill or other
documents evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the
Charterers' behalf or on the behalf of any sub-Charterers) incorporating, where not compulsorily
applicable, the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or
Hague/Visby Rules.  Charterers shall indemnify the Owners against any liability, loss or damage which
may result from any breach of the foregoing provisions of this Clause.


## 104. ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code  for the Security of Ships
and of Port Facilities and the relevant amendments to  Chapter XI of SOLAS (ISPS Code) relating to the
Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing
through United States waters, the Owners shall also comply with the requirements of the US Maritime
Transportation Security Act 2002 (MTSA)  relating to the Vessel and the "Owner" (as defined by the
MTSA).
(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship
Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details
of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by
failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS
Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this
Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon
request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting
is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all
sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall
ensure that all sub-charter parties they enter into during the period of this Charter Party contain the
following
provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is
permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are
likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by
failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except
as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever
arising out of or related to security regulations or measures required by the port facility or any relevant
authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch
services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless
such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures
required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the
other party shall indemnify the paying party.

19

**105.    BIMCO BUNKER FUEL SULPHUR CONTENT CLAUSE FOR
TIME  CHARTER PARTIES 2005**

(A)       Without prejudice to anything else contained in this Charter Party, the Charterers shall supply
fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum
sulphur content requirements of any emission control zone when the vessel is ordered to trade within that
zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors
used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI,
including the guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability,
delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-
Clause (A).

(B)       Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels
in accordance with sub-Clause (A), the Owners warrant that:

(i)        The vessel shall comply with regulations 14 and 18 of Marpol Annex VI and
          with the requirements of any emission control zone;
          and

(ii)       The vessel shall be able to consume fuels of the required sulphur content when
          ordered by the Charterers to trade within any such zone.

Subject to having supplied the vessel with fuels in accordance with sub-Clause (A), the Charterers shall not
otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure
to comply with regulations 14 and 18 of Marpol Annex VI.

(C)       For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol
Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U.
and the U.S. Environmental Protection Agency.


106.

Owners to have the right to sell the vessel at any time during the period of this Charter Party having
promptly informed the Charterers in this respect and to supply them with the name of the new Owners,
subject to Charterers' consent which not to be unreasonably withheld.


107.

Charterers guarantee that they are fully covered with a first class P + I Club including cargo claims, F/D+D
(Freight/Demurrage + Defense)  and full Charterers' liability and will remain so for the total duration of the
present Charter. Charterers' P+I Club:  Gard.

**EXHIBIT A2**

**Louise Norris**

| | |
|---|---|
| **From:** | John W. Hicks [JWH@watersonhicks.com] |
| **Sent:** | 13 March 2008 15:02 |
| **To:** | Glenn Winter |
| **Subject:** | "MANASOTA" - C/P dated 9.11.07 |

**Attachments:** 010000004033-0000007256-0803131622.tif

TO : Winter Scott
ATTN : Glenn Winter
REF : GDW/ln/364/29
FAX : 020 7726 2371

FROM : John Hicks
REF : JWH/WB/1042-31

**"MANASOTA" – C/P dated 9.11.07**

The vessel was delivered at 0500 GMT on 6th November 2007. Almost immediately upon delivery the underwater areas of the vessel were inspected and cleaned at Singapore on 9th November. A copy of the report of the divers Oceanteam Underwater Services dated 9th November is attached from which it may be seen that there was at that time modest underwater growth on the vessel which was cleaned as necessary. The vessel then ballasted to Itaguai where she arrived on 5th December 2007. Because of congestion the vessel was kept idle and only sailed from Itaguai on 23rd December. During this time substantial bottom growth accumulated. Underwater growth is a notorious feature of Brazilian ports, as you will be aware.

The vessel then sailed back in laden condition to Singapore where she arrived for bunkering on 25th January 2008 before discharging and being redelivered in China. While in Singapore on 25th January the bottom was again inspected and it was now found to be heavily fouled. A copy of the report of Pacmarine Services Pte Ltd is also attached.

Your clients have deducted a speed claim from hire in the amount of US$1,025,964.63 plus bunkers said to have been overconsumed amounting to US$152,733.24. Your clients assert that they have overpaid hire by the amount of US$181,604.53. These deductions are not justifiable.

The deduction which your clients have made equates with hire payment for 5.86 days. No explanation has been given for the deduction. It is clear however from the enclosed Voyage Evaluation Report of WNI that the ballast voyage from Singapore to Itaguai was performed at a speed in excess of the Charterparty warranty and with bunker consumption of less than the Charterparty warranted figures. It is selfevident that following the accumulation of bottom fouling at Itaguai the return laden voyage would have been performed at a reduced speed. In fact WNI by their further enclosed Voyage Evaluation Report concluded that the time lost on the laden leg was 74.9 hours or 3.12 days, (not 5.86 days) albeit that their methodology as to the effect of current and weather is flawed. Since your clients have not put forward any evidence to the effect there was any loss of speed on the return laden voyage there is currently no case for our clients to answer at all. Even if a case is raised, you will appreciate that the fouling of the bottom by reason of the delay at Itaguai is the obvious cause.

In the circumstances our clients do not agree that your clients have even a prima facie counterclaim; to the contrary your clients have no defence to the claim which has been brought by the Owners.

We suggest that your clients consent to the release of the principal amount claimed by our clients whereupon interest and costs can be resolved in due course. There will also be claims for the cost

14/03/2008

of cleaning the bottom of the vessel and applying fresh coats of antifouling.

Our clients reserve the right to place a copy of this message before the Judge in New York in the event that your clients disregard its contents.

Kind regards
John Hicks
Waterson Hicks
130 Fenchurch Street
London EC3M 5LY

Tel : +44 20 7929 6060
Fax : +44 20 7929 3748
Email : jwh@watersonhicks.com
Web : www.watersonhicks.com

The contents of this e-mail message and any attachments are confidential, for the use of the addressee only and may be legally privileged. If you are not the intended recipient of this e-mail message any copying, distribution or other action taken or omitted to be taken in reliance upon it is prohibited and may be unlawful. Instead please return the message to the sender by replying to it and then delete the message and any attachments from your computer. Waterson Hicks maintains active anti-virus policies but accepts no liability for any damage which may be caused by any virus inadvertently transmitted by this e-mail or any attachments thereto