UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
THELMA SHIPPING CO. LTD.,  :
                          :   08 Civ. 01804 (PAC)
         Plaintiff,       :
                          :   ECF CASE
    - against -           :
                          :   DECLARATION OF GLENN DANIEL WINTER
                          :   IN SUPPORT OF DEFENDANT'S MOTION
BEIJING SHOU-RONG FORWARDING  :   FOR COUNTER SECURITY
SERVICE CO. LTD. a/k/a BEIJING :
SHOURONG FORWARDING SERVICE  :
CO. LTD.,                 :
-----------------------------------------------------x

I, Glenn Daniel Winter, declare under penalty of perjury of the laws of the United States of America as follows:-

1. I am the Senior Partner of Winter Scott, Solicitors.

2. I have been practising maritime law as a Solicitor since 1982.

3. My practice is, and always has been, primarily related to Charterparty disputes. Since 1982, I have advised on significantly more than one thousand such disputes.

4. I have been instructed on behalf of Beijing Shou-Rong Forwarding Service Co Ltd (hereafter "Charterers") in respect of their dispute with Thelma Shipping Co. Ltd (hereafter "Owners") under the Charterparty entered into on or about 9th November 2007 (hereafter the "Charterparty") for mv "MANASOTA" (hereafter "the vessel").

5. I have seen Mr Hicks' Declaration dated 28th April. I am afraid that I regard some of the comments in that Declaration as rather partisan.

6. Mr Hicks' assertion that there are no practical steps to prevent the accumulation of growth is correct, provided that the vessel's anti-fouling paint was maintained in a good condition. I have seen no evidence that the paint was in bad condition but this is, of course, one of the matters I would wish to test in arbitration. Further, in the Arbitration I intend to argue that Owners should have removed the marine growth before the vessel sailed from Paranagua pursuant to their obligations to maintain the hull in good condition throughout the charter service as per their obligation under clause 1 of the Charterparty to *"keep the vessel in a thoroughly efficient state in hull....for and during the service"*.

7. Mr Hicks' comment that the charterers' failure to serve a Defence to date reflects the frivolous nature of its Counterclaim (and Defence) in general is slightly disingenuous. As Mr Hicks knows full well:-

    (a) It is relatively unusual for a respondent to serve Submissions within the 28 day provided for in the LMAA terms: in my experience, an extension is the norm, rather than the exception;

    (b) In the subject case, Charterers had a good reason to seek an extension for the following reasons:-

    (i) Clause 60 of the Charterparty provides for Owners to appoint a weather routing service to monitor the vessel's performance, with Charterers to pay for half the cost. In my view, it must be implied into this clause that, as Charterers are obliged to pay for half the costs of the report provided by the service, Owners are obliged to provide them with a copy of the report. However, although Charterers repeatedly requested a copy of the report of the laden voyage, in order to assist in the calculation of their speed/consumption claim and although this report appears to have been compiled on 18th February, Owners repeatedly refused to provide this report. In my view that refusal was a clear breach of charter by Owners. Instead, Owners adopted an extremely aggressive approach, obtaining a Rule B Attachment (before the report was provided), starting arbitration proceedings in London (before the report was provided) and serving Submissions of Claim in that arbitration. Only with those Submissions of Claim, was a copy of the report provided.

    (ii) Pursuant to clause 11 of the Charterparty, Charterers were entitled to a copy of the deck and engine logs. A copy of most of the logs was only provided on 18th April. A copy of a missing page was only provided to us on 28th April. I repeatedly made it clear to Mr. Hicks that we could not serve Submissions of Defence and Counterclaim until the logs were provided and reviewed by our experts. However, I would add that the logs were only requested by me on 7th April.

8. Mr Hicks asserts that the vessel's underperformance was caused by hull fouling but, with respect, that will be a matter for the Tribunal, not Mr Hicks.

9. Mr Hicks further asserts that Charterers cannot rely on clause 102 of the pro forma Charterparty incorporated into the fixture, which provides as follows:-

> *"Where the vessel remains at anchorage, in port or idle for an extended period (means excess 20 days) in compliance with Charterers' orders/instructions and this causes fouling of the hull or underwater ports – Owners shall not be responsible for such fouling or any vessel under-performance caused by such fouling."*

The inference arising out of the above clause is that Owners shall be responsible for fouling where the vessel is delayed for a period of 20 days or less.

10. It is Charterers' position that they can rely on this clause for the following reasons:-

(a) The vessel only remained at Itaguai for 18 days.

(b) Although clause 102 appeared in the pro forma and although a similar clause appeared in the recap (without the definition of the extended period), it does not necessarily follow that the definition does not form part of the contract, bearing in mind that:

    (i) Under English Law, the Courts and Arbitrators generally attempt to give effect to every term of the contract (since, for example, *The Helen Miller* [1980] 2 Lloyd's Rep. 95); and

    (ii) It is judicially recognised that Charterparties often contain *"surplusage"* and that undue significance should not therefore be placed on the fact that there may be more than one clause applying to the same issue; see, for example, *The Ann Strathatos* (1949) 83 LL.R. 228.

    (iii) There is a general presumption under English Law that an ambiguous clause will be construed against the party who inserted the clause into the contract (the *"contra preferentum"* rule). In this case, given that clause 102 was Owners' clause (as it was contained in Owners' standard form), we will argue that any ambiguity should be construed against Owners. I would add, however, that this general principle is 'context

sensitive' and is therefore heavily dependent on the views of the Tribunal as to the parties' intention.

(c) Clause 102 was not *"expressly overridden"* by the fixture recap as asserted by Mr Hicks. It would of course, have been open to Owners expressly to propose that clause 102 should be deleted and replaced by the main terms in the recap. However, Owners did not do so.

(d) Even if the definition of 20 days does not form part of the contract, we will be arguing in the London Arbitration that 18 days is not an *"extended period"* for purposes of clause 102 on the basis that 18 days is not an unusually long period for a vessel to remain in port. Indeed, in my experience, many vessels are routinely delayed for much longer periods (bearing in mind that vessel are often obliged to wait for berths). In this regard, although Mr Hicks indicates in his Declaration, that the vessel waited for 18 days at Itaguai to load cargo, the period of 18 days, including the loading time.

It is, of course, for the London Arbitration Tribunal to determine whether the arguments are correct. I do not accept that Mr Hicks can accurately categorise such arguments as *"frivolous"*

11. Charterers do not accept the WNI calculations or their method of calculation. They maintain that, on the basis of the vessel's good weather performance (that is, her performance on days when the vessel met good weather only), the vessel significantly under-performed. This is the correct approach, even where the Charterparty provides for a weather routing service to be instructed; see, for example, London Arbitration 21/04. According to Charterers' calculations (based on their experience), the under-performance gave rise to a claim of US$1,178,697.80, consisting of US$1,025,964.36 in respect of time, US$142,365.10 in respect of IFO and US$10,368.14 in respect of MDO as per their Hire Statement. Of course, Charterers accept that they will need to prove their calculations by expert evidence: however, the assertion that Charterers have made an over-deduction from hire can be countered by a cursory analysis of Owners' own figures. Owners are only claiming hire in the sum of US$984,891.60 (as per paragraph 3 of Mr. Hicks' declarations). This calculation does not give any credit for the under-performance claim. Consequently, even on Owners' own figures, Charterers must have a counterclaim of US$193,806.20 (namely US$1,178,697.80 less US$984,891.60). In fact, this figure is not fully consistent with Charterers' counterclaim of US$170,780.33 because there are other minor discrepancies between the two Hire Statements. These will, of course, be for the Arbitration Tribunal in London to evaluate in due course. In addition, the figure referred to in paragraph 37 of Mr Hicks' Declaration is a figure in respect of lost time only and does not take into account Charterers' claim for the over-consumption of bunkers. Further, Charterers have not deducted the sum of US$1,025,964.63: that sum simply appears to their credit in their final hire statement (which shows a balance due to Charterers of US$181,604.53).

Executed on May 2nd 2008 in London, England

_____
Glenn Daniel Winter